Alexander T. ARTHURS

v.

Chris O. STERN et al.

No. CA 76–4373–T.

United States District Court,
D. Massachusetts.

Order Feb. 1, 1977.

Opinion March 3, 1977.

David Berman, Medford, Me., for plaintiff.

Steven A. Rusconi, Asst. Atty. Gen., Boston, Mass., for defendants.

## ORDER

TAURO, District Judge.

On January 20, 1977 this court held a merged hearing on plaintiff's motion for preliminary injunction and on the merits. At that hearing, the defendants cited Mass. Gen.Laws ch. 112, § 63 in support of their position that proceedings before the Massachusetts Board of Registration and Discipline in Medicine may not be stayed pending resolution of related state criminal proceedings.

After hearing, it is hereby ORDERED that defendants are enjoined from relying upon Mass.Gen.Laws ch. 112, § 63 in denying plaintiff's request for a continuance of the Board's proceedings pending resolution of the criminal charges lodged against plaintiff in Middlesex Superior Court.

An opinion in support of this order will issue.

## OPINION

### I.

The plaintiff, a duly licensed Massachusetts physician for forty years, was indicted on June 11, 1975 by a Middlesex County Grand Jury for allegedly prescribing controlled substances under circumstances that violated Mass.Gen.Laws ch. 94C, § 19(a).[1] These charges are still pending. On October 1, 1976, the defendant Massachusetts Board of Registration and Discipline in Medicine (Board)[2] commenced disciplinary

---

1. Mass.Gen.Laws ch. 94c, § 19(a) provides in pertinent part,

 A prescription for a controlled substance to be valid shall be issued for a legitimate medical purpose by a practitioner acting in the

 usual course of his professional practice.
 . . .

2. The other named defendants are Chris O. Stern (Stern), Executive Secretary of the Board and Nelson Baker (Hearing Officer), a state

proceedings against the plaintiff[3] based on the same circumstances covered by the Middlesex County indictments.[4]

What triggered this law suit was plaintiff's unsuccessful plea to the Hearing Officer that the Board's proceedings be continued until completion of the criminal proceedings, in order to protect fully plaintiff's rights against self-incrimination in the criminal case. The Hearing Officer denied the request for continuance. Mass.Gen. Laws ch. 112, § 63 prohibited him from exercising any discretion in the matter.[5] Plaintiff does not quarrel with the Hearing Officer's interpretation of § 63. Rather, by this action, brought under 42 U.S.C. § 1983,[6] he challenges the constitutionality of § 63, and seeks to enjoin its enforcement.

Plaintiff's argument to the Hearing Officer, as here, was that under Mass.Gen.Laws ch. 112, § 61 and Rule 4.16(a) of the Board's own Rules, Board proceedings are not governed by traditional rules of evidence; that in order to have any realistic chance of avoiding revocation of his license, the doctor would have to testify before the Hearing Officer; that the Hearing Officer and the Board would feel free to draw a negative inference against the plaintiff should he fail to so testify; that the possibility of such a negative inference being drawn has an unconstitutional coercive impact on plaintiff's fifth amendment right to remain silent in the criminal case; and that the challenged statute unconstitutionally deprives the Hearing Officer or the state court from exercising any discretion even to consider such a due process claim as a basis for a continuance.

On December 16, 1976, a temporary restraining order was entered by this court, without objection. After hearing and submission of an agreed statement of facts, the case was submitted on the merits.

---

Hearing Officer who was assigned to preside over the proceedings.

3.  Mass.Gen.Laws ch. 122, § 5 authorizes such proceedings.

    The board shall investigate all complaints relating to the proper practice of medicine by any person holding a certificate of registration under sections two to twelve A, inclusive, or of section sixty-five so far as it relates to medicine and report the same to the proper prosecuting officers.

    The board may, after a hearing pursuant to chapter thirty A, revoke, suspend, or cancel the certificate of registration, or reprimand, censure, or otherwise discipline a physician registered under said sections upon proof satisfactory to a majority of the board that said physician: . . .

    (b) is guilty of an offense against any provision of the laws of the commonwealth relating to the practice of medicine, or any rule or regulation adopted thereunder; . . . .

    .    .    .    .    .    .

4.  The Board's proceedings were commenced by an Order to Show Cause which stated that the Board had reason to believe that the plaintiff was "[i]ssuing a prescription for a controlled substance for other than a legitimate medical purpose, in violation of Gen.Laws ch. 94C, s. 19(a)."

    As a result of formal and informal discovery procedures not otherwise relevant to this decision, plaintiff's counsel was given a copy of the indictment in response to his request for specification of the substance of the Board's charges. Subsequent to the filing of this action, plaintiff was also provided with the patient names, prescriptions and dates which underlie the asserted violations. These further specifications satisfied plaintiff's demands for further notice.

    No suggestion has been made that the plaintiff is incompetent to practice medicine because of physical or mental infirmity or lack of ability.

    The Board did not choose to use its authority under Rule 3.11 of the Board of Registration in Medicine Rules of Procedure to suspend summarily the license of a physician when it deems it in the public's interests to do so. A physician so suspended must be given the opportunity for a hearing within seven days thereafter.

5.  § 63 provides,

    Said boards shall not defer action upon any charge before them until the conviction of the person accused, nor shall the pendency of any charge before any of said boards act as a continuance or ground for delay in a criminal action.

6.  The defendants concede that they are acting under color of state law within the meaning of 42 U.S.C. § 1983.

## II.

### A.

The essence of plaintiff's claim is that Mass.Gen.Laws ch. 112, § 63 imposes upon him an impermissible choice between constitutional rights—his right to protect his medical license, and his right to remain silent in the face of criminal charges. Plaintiff asserts, and defendants do not dispute, that he has a liberty and property interest in his medical license subject to due process protection. *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Shaw v. Hospital Authority*, 507 F.2d 625, 628 (5th Cir. 1975). He claims that the only way he can protect that interest from revocation by the Board is to testify in his own behalf at the Board's disciplinary proceeding. Plaintiff emphasizes that a refusal to testify would be perilous in light of defendants' position that the Board may draw a negative inference from his failure to do so.[7] But plaintiff points out that he is constrained not to testify before the Board, because he is also facing criminal charges arising from the same circumstances about which the Board seeks to inquire. He argues that his fundamental interest in avoiding any possibility of incriminating himself at the criminal trial dictates against prior testimony before the Hearing Officer.[8]

Plaintiff contends that the mandatory provisions of § 63 require him to protect his right to practice medicine at the expense of sacrificing his right against self-incrimination in the face of criminal charges. Were it not for the mandatory feature of the challenged statute that denies the Hearing Officer and the state court the discretion even to consider his due process claims, plaintiff contends that he might not be put to this constitutionally impermissible choice.

But for § 63, the Board could, in its discretion, postpone its proceedings so as to permit the plaintiff first to exercise his self-incrimination rights at trial, and then to protect his due process interests by testifying before the Board in defense of his medical license.

Plaintiff relies primarily upon two cases in support of his position that § 63 presents him with an unconstitutional choice: *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) and *Silver v. McCamey*, 95 U.S.App.D.C. 318, 221 F.2d 873 (1955).

In *Garrity*, the Supreme Court of New Jersey ordered the Attorney General to investigate police misconduct, giving him broad powers to carry out the assignment. Pursuant to that investigation, several policemen were questioned, after having been advised: 1. that their answers could be used against them at subsequent criminal proceedings, 2. that they had a constitutional privilege to refuse to answer on self-incrimination grounds, and 3. that refusing to answer questions would result in their automatic loss of employment under N.J.Rev. Stat. § 2A:81–17.1 (Supp.1965). The defendants in *Garrity* were among those policemen questioned. They opted to answer the questions. The answers were used against them in subsequent criminal proceedings resulting in their conviction on conspiracy charges.

On appeal, the Court struck down the defendants' convictions on the grounds that they were the product of coerced statements. Coercion was found in the state's forcing policemen to choose between self-incrimination and job forfeiture—a choice described as one putting them "between the rock and the whirlpool." 385 U.S. at 498, 87

---

7. Defendants apparently derive their position from Rule 4.16(a) of the Board of Registration in Medicine Rules of Procedure which provides in pertinent part, "Unless otherwise provided by law, the Board need not observe rules of evidence observed by courts but shall observe the rules of privilege recognized by law."

This court does not have before it the question of whether defendants may properly draw

such a negative inference. *See Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

8. Defendants do not dispute that testimony of the plaintiff before the Hearing Officer could be introduced against him in a later criminal trial.

S.Ct. at 619. The Court framed its decision within an established line of authority forbidding states to condition the exercise of constitutional rights on the exaction of a price.[9] In *Garrity*, the right was avoidance of self-incrimination, and the price was loss of employment.[10]

While there are obvious similarities between *Garrity* and the instant case; several distinctions must be recognized. First, the consequence of asserting the self-incrimination privilege in *Garrity* was automatic loss of employment. Here, a negative inference from a failure to testify may be drawn by the Board, but loss of license is not a mandatory consequence of such failure. Second, the procedural setting of *Garrity* was an appeal from criminal convictions based in part on the testimony given by defendants during the civil investigation. It could be argued that *Garrity* only provides relief from the consequences of coercion, and does not serve as a precedent for the prevention of such consequences. For reasons set forth later, this court does not accept so restrictive an interpretation of *Garrity's* reach.

The plaintiff in *Silver v. McCamey*, 95 U.S.App.D.C. 318, 221 F.2d 873 (1955) was a taxicab driver who had been indicted for two separate acts of rape. Prior to his second trial, he was charged by the Board of Revocation and Review of Hackers' Identification Licenses, on the basis of the same incidents, with being of improper character to operate a cab. That Board revoked his license prior to trial. He was subsequently acquitted of all criminal charges.

The plaintiff's suit to regain his license succeeded on due process grounds. In significant language, the Court of Appeals held,

We agree with the District Court that due process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him. His necessary defense in the administrative hearing may disclose his evidence long in advance of his criminal trial and prejudice his defense in that trial.

*Id.* 221 F.2d at 874–75. The court emphasized the fact that there were alternative means of protecting the public against an accused driver pending his criminal trial. First, the License Board could have revoked plaintiff's license on charges other than those which were the subject of the criminal proceedings. Second, that Board could have temporarily suspended plaintiff's license without causing a permanent loss of employment or a preview of plaintiff's defense.

Admittedly, there are distinctions between *Silver* and the instant case. First, *Silver* creates a remedy after a license is revoked. Like *Garrity*, it did not protect the plaintiff from having to make an unconstitutional choice, the relief sought by the plaintiff here. Its holding served only to provide relief from the consequences of such a choice. Second, *Silver* dealt with an ambiguous, though constitutional, statute that was determined to permit the delay of administrative proceedings pending completion of the criminal proceedings. There is no such ambiguity in the provisions of the statute challenged here. *Silver's* condemnation of a discretionary administrative hearing in advance of a criminal trial would appear to be persuasive authority with respect to the mandatory features of § 63.

Finally, the plaintiff argues that *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), does not preclude his claim. In *Baxter*, the Court held that prison officials were allowed to draw an adverse inference from an inmate's invocation of the self-incrimination clause at prison disciplinary proceedings. *Baxter* is distinguishable from the instant case for a num-

---

**9.** *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), is the seminal case in that line of authority.

**10.** In reversing the convictions, the Court left unanswered the question of whether the stat-

ute which created the unconstitutional compulsion was itself unconstitutional. 385 U.S. at 496, 87 S.Ct. 616.

ber of reasons. First, while a prisoner has the right to testify in his own defense at a prison disciplinary hearing, full due process safeguards do not attach to prison disciplinary situations. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Lombardo v. Meachum*, 548 F.2d 13 (1st Cir. 1977). Here, however, the Board hearing could adversely affect plaintiff's protected interest in his license to practice medicine, an interest fully protected by the due process clause. Second, summary disciplinary proceedings were needed in *Baxter* to meet the exigencies of prison life. Here, no such exigencies appear on the record, and even if they did, a less drastic alternative by way of summary suspension was available to the Board.[11] Third, no criminal proceedings were pending in *Baxter* against the inmate, unlike the circumstances facing the plaintiff here.

### B.

The defendants' argument boils down to a single proposition—that the due process clause does not prohibit all adverse consequences that flow from invocation of the privilege against self-incrimination. As a general proposition of law, this court agrees. But as is true with most legal axioms, it is their application to a specific set of facts that dictates the merits of a particular case.

Defendants deny that § 63 forces the plaintiff to choose between his constitutional rights. They suggest that, at most, the statute forces plaintiff to make a tactical decision, whether or not to invoke his privilege against self-incrimination. They argue further that any adverse constitutional consequences that result from such a tactical choice may be challenged collaterally.

Of the authorities cited by defendants, the one most nearly analogous to the instant case is *United States v. Sloan*, 388 F.Supp. 1062 (S.D.N.Y.1975). That case involved the federal prosecution of defendants who were also the subjects of a parallel investigation by the New York Stock Exchange. The defendants requested Judge Knapp to enjoin the Stock Exchange proceedings until the criminal trial, over which he was to preside, was completed. Their argument, like that of the plaintiff here, was that the scheduling of the administrative hearing prior to trial caused impermissible tensions between self-incrimination privileges and due process entitlements to a fair hearing.

In a memorandum opinion, Judge Knapp denied injunctive relief and rejected the contention that defendants' fifth amendment privilege was negated by an unconstitutional choice.

> This contention must be rejected. In *United States v. Kordel* (1970) 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1, . . . the Supreme Court indicated that it was not unfair for a potential or actual defendant in a criminal case to be put to the choice of having to assert the privilege in a related civil matter. (citations omitted).

*Id.* at 1064.

While similarities between the instant case and *Sloan* are apparent, several significant distinctions dilute its impact as a potential persuasive precedent. Unlike the plaintiff here, the defendants in *Sloan* were not confronted by an administrative body threatening to draw a negative inference from their silence. Judge Knapp explicitly stated that,

> . . . it is by no means certain that the Exchange will expel the defendants— or indeed take any disciplinary action against them—if they refuse to answer. The pendency of this criminal proceeding will have to be considered by the Exchange in determining the reasonableness of the defendants' actions.

*Id.* at 1064.

Second, neither Judge Knapp nor the New York Stock Exchange were precluded by legislative enactment from exercising their discretion as to the scheduling of the criminal case in relation to the administrative hearing. Indeed, Judge Knapp's opinion reflects an exercise of his discretion.

---

11. See note 4, *supra* and note 13, *infra*.

Here, however, § 63 explicitly precludes the exercise of such discretion, despite the general recognition that situations may arise where civil proceedings should be deferred until disposition of a related criminal matter. *United States v. Kordel,* 397 U.S. 1, 9, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970); *De Vita v. Sills,* 422 F.2d 1172 (3rd Cir. 1970).

Furthermore, the cited cases upon which *Sloan* and the instant defendants rely are distinguishable from the circumstances involved in this case. For instance, both the defendants and Judge Knapp cite *De Vita v. Sills,* 422 F.2d 1172 (3rd Cir. 1970). In *De Vita,* the New Jersey Supreme Court ordered a state court judge to serve as a Master to investigate corruption charges lodged against another state judge, with the possible result of the latter's disbarment and removal from office. Subsequent to the court's order, a two count state indictment was returned, based on the same alleged misconduct. Thereafter, the judge under investigation sought a preliminary injunction prohibiting the civil proceeding from going forward until the criminal case was completed, arguing potential infringement of his fifth and sixth amendment rights. The Third Circuit affirmed the lower court's denial of injunctive relief, but its opinion clearly reflects a number of fundamental factors distinguishing its holding from the instant case.

First, the hearing sought to be enjoined in *De Vita* was a judicial proceeding that was to be presided over by a state judge, appointed by the New Jersey Supreme Court. The Third Circuit's concern with issues of jurisdiction and abstention with respect to enjoining a state court hearing underscores the judicial nature of the challenged proceeding. The instant case, however, involves a contemporaneous administrative hearing, not subject to the tradition-

al rules of evidence [12] or constitutional restraints. Second, the hearing in *De Vita* was to be held *in camera.* The presiding judge had no power to resolve the issues or take definitive action. His authority was limited to making findings and recommendations to the New Jersey Supreme Court. Third, by order of the New Jersey Supreme Court, any testimony given by the investigated judge at the hearing could not be used against him at a subsequent criminal trial. Thus testimony at the pre-trial hearing could not prejudice his criminal defense. The two proceedings were effectively insulated from one another. These distinctions were recognized implicitly and explicitly by the Third Circuit in its analysis of *De Vita's* underlying circumstances.

> There is nothing in these rules or in the court's order which would compel the plaintiff's testimony. *There is nothing in the rules or the court order from which we can conclude that the plaintiff's failure to testify will be held a ground for disbarment or forfeiture of office.* (emphasis added).

*Id.* at 1177.

In *De Vita,* therefore, plaintiff had the choice of either asserting his privilege with impunity, or testifying with immunity. Neither option is available to the plaintiff here.

Third, *De Vita* like *Sloan,* involved a situation where the authorities had discretion to schedule the civil proceeding after the criminal. The New Jersey Supreme Court was free to schedule the Master's hearing at any time. Similarly, after that court received the Master's recommendations, it had discretion as to when the ultimate questions of disbarment and job forfeiture would be decided. There was no requirement that the court make a ruling prior to the criminal case.[13]

12. See note 7, *supra.*

13. The New Jersey Supreme Court did suspend the judge in question from office and the bar during the pendency of the investigation. Such a temporary suspension worked an effective compromise between the public's interest and the interests of the plaintiff. A similar approach was available to the Board in the instant case under Rule 3.11 of the Board of Registration in Medicine Rules of Procedure. That rule allows temporary suspension of a doctor's license where necessitated by the "health, safety or welfare of the public." Invocation of that rule would require the Board to afford the plaintiff a hearing within seven days.

The *De Vita* court recognized that "Undoubtedly there are cases in which a court in the exercise of its discretion should stay discovery in a civil action pending the disposition of a criminal case." 422 F.2d at 1181. This same wisdom would apply to an administrative hearing. It is the statutory preclusion of such discretion by either the Board or the state court that is challenged by the plaintiff. In *De Vita*, the court determined that, given the safeguards built into the challenged civil proceedings, the investigated judge was merely faced with a difficult choice, not a constitutional dilemma.

Another case relied upon by the defendants and Judge Knapp, *United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970), is clearly distinguishable from the situation before this court. That case involved nearly contemporaneous civil condemnation and criminal proceedings arising out of the same alleged violations of the Food, Drug and Cosmetic Act [14] by a corporation and two of its officers. When interrogatories were put to the corporate defendant in the civil case, it moved for a stay or, in the alternative, for an extension of time in which to answer the interrogatories. After the district court denied the motions the corporation answered the interrogatories. Defendants were ultimately convicted of the criminal charges. On appeal, the Sixth Circuit reversed the convictions of the individual defendants on the basis that the use of interrogatories from a civil proceeding, to obtain evidence in a contemporaneous criminal proceeding, violated the self-incrimination privilege.

After granting certiorari, the Supreme Court reinstated the convictions, finding no violation of fifth amendment guarantees. The circumstances of *Kordel* distinguish it from the instant case. The Court stated that defendants could not raise fifth amendment objections to their convictions because the answers to interrogatories, upon which such objections were based, had been given voluntarily in the civil condemnation case.

Particularly relevant to this case is the *Kordel* Court's approval of the lower court's statement that,

'[t]he Government may not use evidence against a defendant in a criminal case which has been coerced from him under penalty of either giving the evidence or suffering a forfeiture of his property.' 397 U.S. at 13, 90 S.Ct. at 770.

Accepting that proposition of law, it follows that one should be able to avoid such coercion by appealing to a court of equity. It simply does not make sense to require one to suffer the coercion and/or the forfeiture of property in order to invoke the protection of the court. Injunctive as well as remedial relief should be available to one caught "between the rock and the whirlpool." *Garrity v. New Jersey*, 385 U.S. 493, 498, 87 S.Ct. 616, 619, 17 L.Ed.2d 562 (1967). The challenged statute precludes such an opportunity.

Moreover, the civil proceeding scrutinized in *Kordel* was before a court, bound to recognize the privilege against self-incrimination and forbidden to draw adverse inferences from its exercise. Here, plaintiff is confronted with an administrative hearing before a Board not subject to judicial constraints, and which claims the power to draw a negative inference from the exercise of the privilege against self-incrimination.

*Kordel* actually stands for the proposition that the Constitution does not bar civil cases from being processed merely because a criminal indictment from the same facts may be forthcoming or pending. Plaintiff's position is more refined, however, and is well within the boundaries of dictum in *Kordel*.

---

Implicit in such a requirement, however, is that the plaintiff could avoid such a hearing, and assume the attendant consequences. The choice would be his. Here, however, he is being forced to undergo an administrative hearing against his will.

The defendants' position that the plaintiff's continued practice as a physician presents a public hazard must be weighed against the fact that it did not invoke its aforementioned summary powers.

**14.** 21 U.S.C. § 301 *et seq.*

The respondents press upon us the situation where no one can answer the interrogatories addressed to the corporation without subjecting himself to a 'real and appreciable' risk of self-incrimination. *For present purposes we may assume that in such a case the appropriate remedy would be a protective order under Rule 30(b), postponing civil discovery until termination of the criminal action.* (emphasis supplied).

*Id.* 397 U.S. at 8–9, 90 S.Ct. at 768. The thrust of plaintiff's case is that § 63 would preclude even the possibility of such an "appropriate remedy" being granted by either the Board or the state court.

Another case relied on by defendants is *Flint v. Mullen*, 499 F.2d 100 (1st Cir.) *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). In that case, the petitioner was indicted for robbing a bank while on probation. As a result of these charges, the government scheduled a probation violation hearing prior to his criminal trial. Petitioner unsuccessfully sought to postpone the hearing until completion of the criminal proceedings on the grounds that a prior hearing would force him to incriminate himself and to reveal his criminal defenses before trial. For that reason, he opted not to testify in his own behalf at the hearing and, consequently, he was incarcerated for violating his probation.

The First Circuit denied a habeas corpus attack on that incarceration. While conceding that it would be "preferable" to hold the probation hearing after the criminal trial, the court concluded that petitioner was not presented with an unconstitutional dilemma.

The choice whether or not to exercise one's Fifth Amendment right to remain silent must often be made in a setting where there is a concomitant due process right to be heard. Petitioner's decision was, in effect, the same choice he or any other defendant must make when brought to trial.

*Id.* at 103. Relying upon *Palmigiano v. Baxter*, 487 F.2d 1280 (1st Cir. 1973), *rev'd*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the court observed that petitioner's position would be more tenable if an adverse finding were to be based on his silence.

Here, however, the government had to prove its case by extrinsic evidence and there is no indication that defendant was penalized for silence except to the degree that anyone who claims the privilege may be said to forego the possibility of persuading a court in his favor.

.  .  .  .  .

We would view the choice as less strategic were an adverse finding to be based on the fact of defendant's silence, rather than independent evidence, as here.

*Id.* at 103.

As the only First Circuit case urged upon this court, *Flint* is particularly deserving of close analysis, even though it preceded the Supreme Court's opinion in *Palmigiano*. First, *Flint* involved a probation hearing before the superior court—a judicial proceeding—as opposed to the administrative hearing plaintiff seeks to avoid here. In such a judicial proceeding, no adverse consequences would attach to petitioner's exercise of his self-incrimination privilege. Here, however, such consequences are threatened.

Second, the interest at stake in *Flint* was revocation of a deferred sentencing program, as contrasted with revocation of a license to practice medicine threatened in the instant case. While some due process safeguards do attach to probation revocation, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), a party's liberty and property interests in probation are more tenuous than are the corresponding interests in a license to practice a profession. Due process rights and standards in the two situations are not comparable.

Third, the *Flint* court had to deal with the exigencies of getting a convicted felon, accused of a second felony, off the streets. There was no alternative procedure available for temporarily protecting the public's interest until the criminal charges were tried. The Board here had such a temporary option available, Rule 3.11.

Finally, in *Flint*, the court emphasized that,

> [t]he suggestion in the dissent that Rhode Island may have used the violation proceeding to gather evidence is totally inapplicable to any of the present facts; . .

*Id.* at 104. Here, absent an emergency situation endangering the safety and well being of the public, it is difficult to conceive of any justifiable rationale for the § 63 requirement precluding the Board or a court from exercising scheduling discretion. No theory of emergency, incapable of being met by the Board's regulations, has been proffered in this case. As a practical matter, therefore, the challenged statute serves only as a vehicle for criminal pre-trial discovery, an impermissible practice. *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Flint v. Mullen, supra.*

### Conclusion

Three threshold premises are undisputed by parties. First, the defendants seek to act under color of state law within the meaning of 42 U.S.C. § 1983. Second, the plaintiff has a privilege against self-incrimination, available at both the criminal trial and before the Board. Third, plaintiff's medical license constitutes a liberty and property interest protected by the due process clause.

There is no clear precedent with respect to the fundamental issue in this case, the constitutionality of § 63. The plaintiff here, however, falls somewhere within the protections afforded by *Garrity* and *Silver*. Given the teaching of these cases, and the distinguishable features of the cases relied on by defendants, this court concludes that § 63 does impermissibly force the plaintiff to choose between his privilege against self-incrimination and his right under the due process clause to testify in defense of his liberty and property interest in practicing medicine. It is, therefore, unconstitutional.

The plaintiff here is exposed to a threatened negative inference if he pleads his privilege against self-incrimination before the Board. Such a foreseeable consequence runs contrary to the established proposition that one may not be coerced into choosing between self-incrimination and the loss of an interest protected by due process rights. *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1969); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

Admittedly, the consequences of this plaintiff asserting his right against self-incrimination are neither so clear nor severe as they were in *Garrity*—in that there is no automatic revocation. But it is sophistry to argue that the negative inference with which plaintiff is threatened serves to do anything less than to chill his privilege against self-incrimination. It is this negative inference that makes the instant case more analogous to *Garrity* than to cases relied on by the defendants and Judge Knapp in *Sloan*: *De Vita, Kordel, Flint* and *McGautha v. California*,[15] 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). The latter cases involved challenged judicial proceedings that paralleled related criminal trials. In those cases priorities as to scheduling were a matter of discretion. This case involves a challenged administrative hearing which by statute may not be stayed pending the conclusion of a related criminal case. Where the contemporaneous civil proceedings are judicial, no adverse consequences may attach to invoking fifth amendment rights. Here, the contrary is threatened, and the mandatory language of the challenged statute precludes either the Board or a court from weighing the due process impact of such a threat.[16] These distinctions are critical.

---

**15.** *McGautha* was an unsuccessful challenge to California's system of having the same jury decide guilt and punishment in capital cases. Again, the distinguishing feature of that case is that the challenged procedure was judicial not administrative, and was subject, therefore, to traditional constitutional and procedural safeguards.

**16.** The focus of this opinion is the impact of § 63. The court does not reach the question of whether a discretionary refusal by the Board under like circumstances would be unconstitutional.

Judgment for the plaintiff is entered in accordance with the attached order issued on February 1, 1977.